**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

MAR 1 0 1997

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

EB Halpern

METALS RESOURCES, INC. d/b/a )
METALS RESOURCES, OF TENNESSEE, )
INC., a Delaware Corporation, )
and COMMERCIAL METALS SF/JV )
COMPANY, a subsidiary of )
COMMERCIAL METALS COMPANY, )
a Delaware Corporation, )
collectively d/b/a COMMERCIAL- )
SOUTHERN RECYCLING, a Tennessee )
General Partnership, )
)
     Plaintiffs )
)
v. )   CV NO. 95-HM-0375-NW
)
MARK L. MOORE, LEESA G. )
MOORE, WHITETAIL LEASING, )
INC., WHITETAIL METALS, INC., )
NORTH ALABAMA SCRAP COMPANY )
and MOORE AND LANDERS, INC., )
)
     Defendants )

**ENTERED**

MAR 1 0 1997

### MEMORANDUM OPINION

The above-entitled civil action is currently before this Court

on the Motion for Summary Judgment, filed by corporate Plaintiffs

Metal Resources, Inc. [hereinafter "Metals Resources"] and

Commercial Metals SF/JV Company [hereinafter "Commercial Metals"],

collectively doing business as the partnership Commercial Southern

Recycling [all Plaintiffs hereinafter collectively referred to as

"CSR"][1], on August 19, 1996. On November 4, 1996, this Court issued

---

[1]This Court here notes that under Alabama law as it existed at
the time this partnership was formed, a general partnership could
be sued in the partnership name, but could not bring suit in that
name. Instead, all partners had to join together to bring suit to
enforce a partnership claim. *See Metzger Brothers, Inc. v.
Friedman*, 288 Ala. 386, 396 (1971). With Alabama's adoption of the
Revised Uniform Partnership Act, partnerships formed on or after
January 1, 1997 and all partnerships as of January 1, 2001 may sue
or be sued in the partnership name. *See* Ala. Code § 10-8A-307(a),

a Summary Judgment Submission Order setting out time certain for the party litigants to file briefs, arguments, and evidentiary matter. This Motion for Summary Judgment was taken under submission by this Court on December 18, 1996. This Court, having considered the party litigants' submissions and for the reasons which follow, is of the opinion that Plaintiff CSR's Motion for Summary Judgment is due to be denied.

### FACTUAL AND PROCEDURAL BACKGROUND

This civil action was commenced on February 14, 1995 when Plaintiff CSR filed their Complaint directly in this United States District Court. Plaintiff's Complaint, though not specifically denominated as such, alleged essentially three claims: breach of a contract for the sale of assets of a going business, breach of a covenant not to compete, and conversion. This Court's jurisdiction is predicated on diversity of citizenship and amount in controversy pursuant to 28 U.S.C. § 1332(a).[2]

The dispute in this civil action centers around three interrelated contracts between the Plaintiff partnership CSR and Defendant Mark Moore individually and as owner of the Defendant Businesses: an Asset Purchase Agreement, a Noncompetition Covenant, and a Nondisclosure/Employment-At-Will Agreement. Defendant Mark L. Moore, with the help of his wife, Defendant Leesa G. Moore, had

---

1106 (Supp. 1996).

[2]All defendants (both individual and corporate) are citizens of the State of Alabama. The corporate Plaintiffs, which are the general partners of CSR, are both Delaware Corporations, with Metals Resources having its principal place of business in Tennessee and Commercial Metals in Texas.

2

apparently started and operated a number of small businesses. One
(or possibly more) of these enterprises involved the collection and
resale of scrap metal, while others involved logging, trucking, and
equipment leasing.[3]    The scrap metal business was the most
successful of all of these, primarily due to some business contacts
Defendant Moore and his company had with officials at the Tennessee
Valley Authority [hereinafter "TVA"] and contracts which resulted
therefrom to purchase and haul away scrap from various TVA sites.
Mr. Moore, however, had some problems with the Internal Revenue
Service regarding unpaid income taxes on money he earned in this
scrap operation. According to his own deposition testimony, this
became a heavy financial burden which Mr. Moore determined could
best be met by selling his business.    Defendant Moore had
previously had business dealings with both corporate Plaintiffs
Commercial Metals and Metals Resources and they were interested in
purchasing all Moore's assets pertaining to his scrap operations,
especially the contracts and business contacts with TVA, for their
CSR partnership.

     Under date of August 24, 1993, Defendant Moore entered into an

---

[3]The record in this case is in some conflict as to the
entityship of the Defendants Whitetail Leasing, Whitetail Metals,
North Alabama Scrap Company, and Moore and Landers.    While
Plaintiff alleges that all of the aforementioned except Moore and
Landers are corporations, Defendant Mark Moore in his deposition
claimed that none of these businesses were ever incorporated and
indicated that they were all sole proprietorships. See Plaintiff's
Original Complaint at 2; Moore Deposition at 12, 22, 24, 26.
However, the asset purchase agreement itself and the tax record
attached to the Moore Deposition refer to Whitetail Leasing and
Whitetail Metals as corporations and the others as sole
proprietorships.    Regardless of form, all named Defendants are
Alabama citizens.

3

Asset Purchase Agreement, a Non-Competition Covenant, and a
Nondisclosure Employment-At-Will Agreement. Under the terms of the
Asset Purchase Agreement, Defendant Moore agreed to sell specified
tangible personal property and accounts for $183,500.00 and agreed
to enter into the noncompetition covenant for $1,500.00, for a sum
total of $185,000.00 for the entire transaction. CSR agreed and
eventually contracted in the Employment-At-Will agreement to hire
Defendant Moore to work in its scrap operations and to continue to
develop business relationships with TVA especially. A true and
correct copy of all three contracts is attached to this Memorandum
Opinion in the Appendix.

Defendant Mark Moore was an at-will employee of Plaintiff CSR
following the asset sale in August of 1993 and continuing until
July of 1994, at which time Plaintiff CSR terminated Defendant
Moore's employment, apparently because the CSR partnership was
halting or intended to halt its scrap and recycling operations.
Under the terms of the Noncompetition Covenant signed August 24,
1993, Moore was forbidden to "directly or indirectly, solicit or
divert from Buyer, or assist another person or entity to solicit or
divert, scrap metal business or similar or related businesses or
services" as well as to "directly or indirectly, compete or engage
in, or assist another person or entity to compete or engage in any
scrap metal business or similar business in competition with Buyer's
business." Non-Competition Covenant at ¶ 2(a, b). This agreement
to the contrary notwithstanding, Defendant Moore, following his
termination by Plaintiff CSR, accepted employment with Berman

4

Brothers Iron & Metal Company, Inc. [hereinafter "Berman"], a company to which Moore had sold scrap in the past and which was a direct and current competitor with CSR. This arrangement not only involved Moore becoming an employee who hauled scrap for Berman, but also involved Moore's leasing some necessary equipment to Berman as well. Moore's Deposition at 81-82. Plaintiff CSR claims that Moore's acceptance of employment and contracts with Berman constituted a breach of the Noncompetition Covenant.

Additionally, Plaintiff CSR claims that several items of equipment which were purchased by CSR in the Asset Sale were never delivered to CSR by Defendant Moore.[4] According to Plaintiff's Complaint and Summary Judgment Brief, Moore refused to deliver these items to CSR until he was paid certain sums of money he claims CSR owed him from his now terminated employment tenure with CSR. The failure to deliver these items is the basis for the claims of breach of the Asset Purchase Agreement and conversion. The sums of money allegedly owed Moore by CSR form the basis for Moore's counterclaim against CSR, contained in his Answer filed March 23, 1995.

United States District Judge Sharon Lovelace Blackburn (to whom this civil action was initially assigned) entered a Rule 16 Scheduling Order on June 20, 1995, setting trial on February 19, 1996. Judge Blackburn also directed the party litigants by Order dated July 11, 1995, to conduct non-binding mediation. On July 24,

---

[4]These items include, among others, a 49 inch magnet, three generators, five sets of torches, and several trailers and tractors. See Plaintiff's Complaint at ¶ 4.

5

1995, with leave of Court, Plaintiff CSR filed an Amended Complaint adding Berman as a party defendant. On August 17, 1995, this civil action was reassigned to this HM Senior United States District Judge. On Motion of Plaintiff, newly added Defendant Berman was dismissed with prejudice as a party litigant by Order dated October 3, 1995. By letter dated November 3, 1995, this Court was notified that the Mediation ordered by Judge Blackburn was unsuccessful. On February 13, 1996, this Court entered an Order canceling the Jury trial set for February 19, 1996. The currently pending Motion for Summary Judgment was filed August 19, 1996.

### STANDARD OF REVIEW FOR SUMMARY JUDGMENT

The Court will grant summary judgment when "there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In cases where the movant is the defendant, that party must show that the nonmoving party, the plaintiff, lacks evidence to support an essential element of his or her claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), *remanded*, 826 F.2d 33 (D.C. Cir. 1987), *cert. denied*, 484 U.S. 1066 (1988). Where the movant is the plaintiff, that party must establish the absence of an issue of material fact with regard to every element essential to his or claim. *Celotex*, 477 U.S. at 325.

The movant's burden is "discharged by showing -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Id.* However, it is not sufficient for the movant merely to point out to the court

6

this absence of evidence. *Id.* at 323; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Rather,

> [a] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

Only after the movant meets its initial burden does any obligation on the party of the nonmovant arise. *Id.; Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 160 (1970); *Clark*, 929 F.2d at 608. However, once the movant meets this initial burden, the opposing party must demonstrate evidence establishing a material issue of fact. *Celotex*, 477 U.S. at 325. The nonmoving party must go "beyond the pleadings" and introduce evidence designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324.

The court must view all evidence and factual inferences in the light most favorable to the nonmoving party. *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987); *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir. 1987). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)(emphasis in original). An issue is not "genuine" if it is not supported by evidence or is created by evidence that is "merely

7

colorable" or "not significantly probative." *Id.* at 250. Similarly, a fact is not "material" unless it is identified by the controlling substantive law as an essential element of the nonmoving party's case. *Id.* at 248. Therefore, to defeat a motion for summary judgment, the nonmoving party must come forward with specific evidence of every element essential to his or her case as to create a *genuine* issue for trial. *Celotex,* 477 U.S. at 323; *Rollins,* 833 F.2d at 1528.

Additionally, this Court notes that Rule 56(d) of the Federal Rules of Civil Procedure provides that

> [i]f on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall there upon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

Therefore, if this Court determines that Plaintiff CSR's Motion for Summary Judgment is not due to be granted and Rule 58 Final Judgment is not due to be entered thereon, thus necessitating this civil action's proceeding to trial, this Court may, consistent with Rule 56(d), enter an Order finding certain facts to have been established during the Summary Judgment proceedings and narrowing those facts necessary to be established at trial.

## DISCUSSION

8

Before reaching the merits of the Summary Judgment Motion, this Court must first determine the law governing the various aspects of this controversy. Each of the contracts in question in this civil action contains a choice of law clause. The contracting parties agreed contractually that the law of the State of Tennessee would apply to the construction and enforcement of the contracts. *See* Asset Purchase Agreement at ¶ 12(c); Non-Competition Covenant at ¶ 5(b); Nondisclosure/Employment-At-Will Agreement at ¶ 12. Both party litigants have conceded in brief that, with respect to the breach of contract claims only, Tennessee law will govern issues of validity, legality, and breach. Alabama courts generally enforce such contractual choices of governing law. *See Hughes Assocs., Inc. v. Printed Circuit Corp.*, 631 F. Supp. 851, 854-55 (N.D. Ala. 1986) (Haltom, J.); *J.R. Watkins Co. v. Hill*, 214 Ala. 507, 509 (1926). However, in Alabama, the law of the forum governs the remedy available to the party litigants. *Hughes Assocs.*, 631 F. Supp. at 855; *Macey v. Crum*, 249 Ala. 249 (1947). Therefore, for all purposes except the remedy (for which Alabama law governs), the law of the State of Tennessee will be applied to the two contract claims by this Court as it sits in diversity.

With respect to the tort claim for conversion, this Court holds that Alabama follows the traditional conflict of laws approach. As announced by the Alabama Supreme Court in the oft-cited case of *Alabama Great S. R.R. Co. v. Carroll,* 97 Ala. 126 (1892), the *lex loci delicti*, or law of the place of the injury, governs tort claims in Alabama courts. Thus with respect to the

9

conversion claim by Plaintiff CSR, Alabama law will be applied.

This Court will analyze Plaintiff's submissions on a claim-by-claim basis, beginning with the claim for breach of the Asset Purchase Agreement. The party litigants in this civil action did not inform this Court in brief of the elements of an action for breach of contract under the law of the State of Tennessee. This Court has conducted extensive research on the subject, and much to the Court's surprise, there is no apposite case law or statute directly setting forth the element of this basic claim under Tennessee law. The Court did, however, find a statutory enactment of a common law claim for procurement of breach of contract. Tenn. Stat. Ann. § 47-50-109. In the cases construing this statute, Tennessee courts have held that the elements of this claim include:

> there must be a legal contract; the wrongdoer must have knowledge of the existence of the contract; there must be an intention to induce its breach; the wrongdoer must have acted maliciously; there must be a breach of the contract; the act complained of must be the proximate cause of the breach of the contract; and, there must have been damages resulting from the breach of the contract.

*New Life Corp. v. Thomas Nelson, Inc.*, 932 S.W.2d 921, 926 (Tenn. Ct. App. 1996)(citations omitted). This holding implies and this Court holds that for a pure breach of contract action under Tennessee law, it must be proved [1] that there was a legal, enforceable contract, [2] the contract was breached, and [3] damages resulted from that breach.

At the heart of Plaintiff's claim for breach of the Asset Purchase Agreement is Plaintiff's contention that these items are still in the possession of Defendant Moore. It is undisputed by

10

either party that the asset purchase agreement is a valid, legal
and enforceable contract. **Therefore, pursuant to Rule 56(d) of the
Federal Rules of Civil Procedure, this Court hold that this element
of Plaintiff's claim for breach of the Asset Purchase Agreement is
established and need not be and the Court will not allow this
element to be disputed at trial.**

It is true and also undisputed that the items detailed in
Plaintiff's Complaint were conveyed to Plaintiff CSR as a part of
the asset sale but are still in Moore's possession. *See* Plaintiff's
Complaint at ¶ 4; Moore's Deposition at 43-50. However, Defendant
Moore also was quick to point out in his deposition testimony that
he would not forbid nor interfere with Plaintiff CSR if it were to
come pick up the equipment. He acknowledged that CSR had paid for
the equipment and stated that  CSR was "welcome to come get it."
He simply refused to transport the equipment to them until his
dispute over wages owed (which forms the basis of his counterclaim
against CSR) was resolved. Moore's Deposition at 60-61, 70.
Plaintiff has offered no evidence that Moore refused to allow them
pick up their property.  Thus the question for this Court is
whether this factual situation constitutes a breach of the
contract.

This Court feels compelled to point out that it would be in a
position to rule on this issue had it been properly briefed by the
party litigants. Instead, each party has merely stated the facts
as detailed up to this point and summarily concluded that they
point in his or its respective favor. There has been no case law

11

cited to this Court, from either Tennessee or Alabama, on whether this factual situation constitutes a breach of the contract in question, which was silent on the issue of delivery. There is no argument whatsoever as to whether the provisions of Tennessee's (or Alabama's for that matter) adopted version of the Uniform Commercial Code, which in Article 2, Section 308 provides a "gap filler" for contracts for the sale of goods which do not contain a provision for delivery of goods, would be applicable to the contract at bar. Plaintiff also absolutely failed to prove how and in what amount it has been damaged by these items remaining undelivered to Plaintiff. In light of Plaintiff's failure to adequately point to law which would support its contention that the sales contract was breached by Defendant Moore's failure to deliver specified equipment to Plaintiff and Plaintiff's failure to prove the amount of damages this non-delivery has caused, this Court cannot hold that there is an absence of a genuine issue of material fact and that Plaintiff is entitled to judgment as a matter of law. Accordingly, Summary Judgment must be denied with respect to the claim for breach of the Asset Purchase Agreement. Moreover, this Court finds and holds that the Asset Purchase Agreement is a valid, legal contract, satisfying the first element of the claim for breach of contract as set out above. **Therefore, pursuant to Rule 56(d), this Court holds that with respect to its claim for breach of the Asset Purchase Agreement Plaintiff has failed to establish and this civil action will proceed to trial on the issues of [1] whether there was a breach of the Asset Purchase Agreement and [2] whether such breach**

12

**damaged the Plaintiff and if so in what amount.**

The briefing situation is unfortunately similar regarding Plaintiff's claim for conversion. The party litigants did not even bother to cite this Court to case law setting forth the elements of the tort of conversion, either under Alabama or Tennessee law, much less offer proof of whether each such element has been satisfied by evidence properly before this Court. Having offered the party litigants an opportunity to brief the issue and submit evidentiary matter thereon, this Court simply declines to rule on a claim on summary judgment which the party litigants have not argued in brief. **Accordingly, this civil action will proceed to trial on each and every element of Plaintiff CSR's tort claim for conversion under Alabama state law.**

The final claim before this Court on Plaintiff's Motion for Summary Judgment is the alleged breach by Defendant Mark Moore of the Noncompetition Covenant. As was the case with the claim for breach of the Asset Purchase Agreement, Movant/Plaintiff must show [1] that the covenant is valid and enforceable, [2] that the covenant has been breached, and [3] that damages resulted therefrom. Pursuant to the parties' contractual choice, Tennessee law governs issues of formation, legality, and validity. CSR has shown and Defendant does not dispute that Tennessee law recognizes the validity of such covenants not to compete so long as they are reasonable in time and geography. *Dabora, Inc. v. Kline*, 884 S.W.2d 475 (Tenn. Ct. App. 1994) (holding valid a three-year-long nationwide covenant not to compete). However, Alabama will only

13

enforce the Tennessee law which holds this covenant valid to the extent that enforcing the covenant does not violate a fundamental tenet of Alabama public policy. *Hughes Assocs.*, 631 F. Supp. at 855; Restatement (Second) of Conflict of Laws § 187(2)(b).

Thus Plaintiff must show and this Court must determine whether the enforcement of this particular Noncompetition Covenant would violate a fundamental tenet of Alabama public policy. Section 8-1-1 of the Code of Alabama[5] provides that contracts in restraint of trade are generally void except, as here, in the employer-employee context.[6] Alabama courts have established guidelines for enforcing such employment covenants not to compete. To be enforceable, a covenant must meet the following criteria:

1. the employer has a protectable interest;
2. the restriction is reasonably related to that interest;
3. the restriction is reasonable in time and place;
4. the restriction imposes no undue hardship on the employee;
5. there must be adequate consideration for the

---

[5]That section reads as follows:

(a) Every contract by which anyone is restrained from exercising a lawful profession, trade, or business of any kind otherwise than is provided by this section is to that extent void.
(b) One who sells the good will of a business may agree with the buyer and one who is employed as an agent, servant or employee may agree with his employer to refrain from carrying on or engaging in a similar business and from soliciting old customers of such employer within a specified county, city, or part thereof so long as the buyer, or any person deriving title to the good will from him, or employer carries on a like business therein.

[6]The Court here notes that Defendant Moore's entering into the Noncompetition Covenant was part of the consideration for the Nondisclosure/Employment-At-Will Agreement.

14

restriction.

*See Hughes Assocs.*, 631 F. Supp. at 856; *Kemper v. Cox and Assoc.*, 434 So. 2d 1380 (Ala. 1983); *Devoe v. Chatham*, 413 So. 2d 1141 (Ala. 1982); *Doughtry v. Capital Gas Co.*, 285 Ala. 89 (1970).

Plaintiff CSR argues that the noncompetition agreement at bar meets all of the above tests. They argue that they bought the right to Moore's contracts and unique business contacts with TVA and that Moore possessed special knowledge about the competitive market, locations, and potential customers. CSR also cites the fact that Moore acknowledged in the text of the Noncompetition Agreement that "[t]he value of [CSR's] acquisition of such assets would be diminished materially in the event that [Moore] were to compete with [CSR] . . . or to divulge any Confidential Information." Noncompetition Covenant at 1. Defendant Moore attempts to dispute this fact and cites case law in support of that assertion, but his argument is truly aimed at the reasonableness in time and place requirement and will be addressed by this Court in that context. This Court finds that there is no genuine issue of material fact that CSR did have a protectable interest. **Accordingly, pursuant to Rule 56(d), the issue of CSR's having a protectable interest will not be litigated at trial, this Court having found that there is no substantial controversy over this issue.**

Further, CSR argues that the restrictions in the covenant were reasonably related to protecting that interest. Moore's other operations, including logging and trucking, were not affected by

15

the agreement; only "scrap metal or similar business[es] were mentioned in the agreement. Noncompetition Covenant at ¶ 2. Furthermore, CSR points out that in deposition, Moore stated that he planned to be trained in and commence work doing asbestos removal, which also was allowable under the covenant. Moore's Deposition at 104-06. Defendant Moore does not dispute the reasonableness of this restriction and acknowledged as much in the agreement. Noncompetition Covenant at ¶ 4. It thus appears to this Court that the restrictions were reasonably related to CSR's protectable interest and this Court so holds. Accordingly, pursuant to Rule 56(d), the Court holds that there is no substantial controversy over this issue and it will not be litigated at trial.

Additionally, this Court finds itself in agreement with Plaintiff CSR that the restriction imposed no undue hardship on Defendant Moore and that there was adequate consideration therefor. Defendant Moore was not restricted from employment in other fields, and he indicated in deposition that he had secured employment removing asbestos. Moore's Deposition at 104-06. Consequently, pursuant to Rule 56(d), this Court holds that there is no substantial controversy with respect to these issues and they will not be litigated at trial.

Finally, Plaintiff CSR must establish by competent proof that the restrictions are reasonable as to time and place in order for this Court to enforce the Noncompetition Covenant's restrictions. Plaintiff CSR asserts that a five year, 250 mile radius from

16

Chattanooga, Tennessee restriction is reasonable and cites cases in support thereof. Plaintiff also cites this Court to Moore's acknowledgment in the agreement that the restriction was reasonable. Noncompetition Covenant at ¶ 4. Defendant Moore (though styling this in brief as an objection to CSR's having a protectable interest) argues that CSR shut down its scrap and recycling operations within a 250 mile radius of Chattanooga and within five years of Moore's leaving CSR's employment. Therefore, it is no longer reasonable in time and place, Moore argues, to require noncompetition where CSR is no longer in the marketplace. In support of this position, Moore cites this Court to *Nationwide Mut. Ins. Co. v. Cornutt*, 907 F.2d 1085, 1087 (11th Cir. 1990), where the Court wrote, "[t]o secure enforcement of a non-compete clause within a particular territory, the employer must demonstrate that it continues to engage, in that locale, in the activity that it seeks to enjoin." *See also Central Bank of the South v. Beasley*, 439 So. 2d 70, 73 (Ala. 1983)(applying a two county restriction to one county only).

This Court finds that Defendant Moore has shown that there is a genuine issue of material fact as to whether CSR remained in the scrap business in the specified area and within the specified time limit. In his deposition, Moore stated that the reason he was terminated by CSR in June of 1994 was "they [CSR] said they were shutting it down." Moore's Deposition at 40. Additionally, Bob

17

Goins,[7] who was also present when Moore was told he would be terminated, stated in his deposition that CSR had decided, after nine months of unprofitability, to cease daily operations, resulting in the need to terminate Defendant Moore. Goins's Deposition at 22-23. These evidentiary submissions establish and this Court finds the existence of a genuine issue of the material fact as to whether or not the restriction was enforceable as to time and place due to CSR's ceasing operations.

The Court here notes that this determination will also bear directly on whether there was a breach of the Noncompetition Covenant (i.e., element two of the claim). Obviously, if Plaintiff CSR had shut down its scrap and recycling operations by the time that Defendant Mark Moore went to work for Berman Brothers, Moore was not competing with CSR in violation of his covenant. However, if it is established at trial that CSR was still in the scrap and recycling business at any time during which Moore worked for Berman, such would certainly constitute a breach of the Noncompetition Covenant. With respect to the damages element of the claim, since there has been no establishment of the date as of which Plaintiff partnership CSR halted their scrap and recycling operations, Plaintiff has not demonstrated how long, if at all, Defendant Moore competed against it. Therefore, the amount of damages resulting from this alleged breach has not been proven and

---

[7]Unfortunately, the Court's records as well as the parties' submissions fail to indicate what relationship Mr. Goins had to the transactions in this case. The Court was only provided with three pages of his deposition.

18

is still in controversy as well.

This Court finds and holds that Plaintiff has failed to establish and, pursuant to Rule 56(d), this civil action will proceed to trial on the issues of [1] whether the Noncompetition Covenant was reasonable in its restrictions of time and place regarding the time Plaintiff CSR ceased its recycling operations and [2] whether Defendant Moore breached the Noncompetition Covenant by working for CSR's competitor Berman Brothers while CSR was still conducting scrap and recycling operations and if so to what extent Plaintiff was damaged thereby.

Finally, the Court must note the argument made by Defendant Moore that the corporations which are the general partners of CSR are not entitled to utilize an Alabama court to enforce the contracts at bar in this action because, as foreign corporations, they failed to register to do business in this state, as required by Section 10-2A-247 of the Code of Alabama.[8] However, there is an exception to this prohibition where business transacted was interstate in nature. *See Hughes Assocs.*, 631 F. Supp. at 858-59. However, since Plaintiff CSR has failed to meet his burden of showing that there is no genuine issue of material fact and since the briefs and evidentiary submissions make only conclusory allegations bereft of supporting facts as to whether these Plaintiff corporations, acting together as a general partnership,

---

[8]This code section was in force at the time the contracts in question were executed. Subsequently, this section has been repealed and recodified at Section 10-2B-15.02, which recodification was in effect at the time this action was filed.

19

were engaged in interstate commerce so as to meet the exception, the Court at this time need not rule on this point and declines to do so.

Since this Court has determined that there exists a genuine issue of material fact as to each claim made by Plaintiff CSR in its Complaint, this Court holds that the Motion for Summary Judgment filed by Plaintiff CSR on August 19, 1996, is due to be denied.

### CONCLUSION

For the reasons hereinabove stated, Plaintiff's Motion for Summary Judgment is due to be denied. This case will proceed to trial only on the issues set out above. An appropriate Order in conformity with this Memorandum Opinion is entered contemporaneously herewith.

DONE this 10th day of March, 1997.

E.B. HALTOM, JR.
SENIOR UNITED STATES DISTRICT JUDGE

#### FLORENCE. ALABAMA ADDRESS:

U.S. District Court
Northern District of Alabama
U.S. Post Office & Courthouse
210 North Seminary Street
P.O. Box 1076
Florence, AL 35630
Telephone: (205) 760-8415

20

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement made and entered into as of this 24th day of August, 1993, by and between Mark L. Moore, Individually, Leesa G. Moore, Individually, North Alabama Scrap Company, a Sole Proprietorship owned by Mark L. Moore, Whitetail Leasing, Inc., an Alabama corporation, whose Sole Shareholder is Mark L. Moore, and Whitetail Metals, Inc., an Alabama corporation, whose Sole Shareholder is Mark L. Moore and Moore and Landers, Inc., an Alabama Corporation (hereinafter collectively, "Seller") and Commercial-Southern Recycling, a Tennessee General Partnership, (hereinafter "Buyer").

### WIINESSEIH:

THAT WHEREAS, Seller operates a scrap metal business and is the owner of certain assets relating thereto; and

WHEREAS, Seller desires to sell and Buyer desires to purchase certain of Seller's assets more particularly described herein and subject to the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants contained herein, Seller and Buyer hereby agree as follows:

1.   Purchase and Sale of Assets.

Seller agrees to sell, transfer, convey, assign and deliver to Buyer and Buyer agrees to purchase and accept from Seller all the following assets (the "Assets"):

(i)   Tangible Personal Property.  The tangible personal property owned by Seller and used or useful in the operation of the businesses of Seller including equipment located at Seller's business premises and as described in Exhibit A hereto.

(ii)   Industrial Accounts and Service Contracts.   Seller currently services and removes scrap from or has other business relationships with industrial accounts, including without limitation, the Tennessee Valley Authority ("TVA"), all of which Seller hereby sells, transfers, conveys, assigns and delivers to Buyer.  Such accounts include, but are not limited to, those listed in Exhibit A hereto.

2.   Purchase Price and Method of Payment.

The Purchase Price for the Assets acquired hereunder shall be One Hundred Eighty-five Thousand Dollars ($185,000.00).  The Purchase Price shall be paid at closing by Cashier's Check or Wire Transfer, provided, however, that Buyer shall have the right to reduce the Purchase Price by any amount necessary in order to satisfy any indebtedness of Seller which encumbers the Assets and to directly pay such amount directly to Seller's creditor(s).  This right shall not relieve Seller's duty to convey all assets in accordance with Section Five (5) herein.

3.   Allocation of Purchase Price.

The Purchase Price shall be allocated as follows:

| | |
|---|---|
| Tangible Personal Property and Accounts | $183,500.00 |
| Noncompetition Covenant | $   1,500.00 |

DEPOSITION EXHIBIT

APPENDIX

Initials: ___GSR___
Company

___mcm___
Employee

#### 4.   Assumption of Liabilities.

Buyer will not assume any debts, liabilities, obligations, expenses, taxes, contracts or commitments of Seller of any kind, character or description, whether accrued, absolute, contingent or otherwise, no matter whether arising before or after the closing, and whether or not reflected or reserved against in Seller's financial statements, books of accounts or records. Seller will indemnify Buyer against and hold it harmless from any such obligations and liabilities. Seller shall pay all transfer taxes and sales taxes which may be due to any governmental body as a result of the transaction.

#### 5.   Seller's Representations and Warranties.

Seller represents, warrants, and agrees as follows:

(a)      Mark L. Moore is the sole shareholder of Whitetail Metals, Inc., Moore and Landers, Inc. and Whitetail Leasing, Inc., which Companies are hereby conveying certain of the assets which are being sold to Buyer. This transaction has been duly authorized and approved by the Seller and the Board of Directors of Whitetail Metals, Inc. and Whitetail Leasing, Inc. and the same shall be evidenced by Corporate Resolutions.

(b)      Seller represents and warrants that (i) Seller is the record and beneficial owner of the Assets, free and clear of all liens, claims, charges, restrictions, security interests, equities, proxies, pledges or encumbrances of any kind; (ii) Seller has the full right, power, authority and capacity to sell and transfer the Assets owned by Seller; (iii) by virtue of the transfer of the Assets to Buyer at the closing, Buyer will obtain full title to such Assets, free and clear of all liens, claims, charges, restrictions, security interests, equities, proxies, pledges or encumbrances of any kind.

(c)      There are no judgments, liens, actions, or proceedings, pending or threatened against Seller or against the assets being sold to Buyer; nor does Seller know or have reasonable grounds to know of any such action, or any governmental investigation relative to Seller, or any of its properties.

(d)      All tangible personal property to be conveyed hereunder is sold in good condition.

(e)      There is no agent, broker or finder who has any right or claim against Seller for a commission, brokerage fee, or similar right to compensation in connection with the transaction contemplated herein.

(f)      Seller is in compliance with all agreements and obligations to the industrial accounts referred to in Section 1 and with any open brokerage or service contracts referred to in Section 1. Seller agrees to provide Buyer with copies of all such agreements at the closing.

(g)      The execution and delivery of this Agreement by Seller does not, and the consummation of the transactions contemplated hereby will not, (i) violate any provision of, or result in the creation of any lien or security interest under, any agreement, indenture, instrument, lease, security agreement, mortgage or lien to which Seller is a party or by which any of Seller's assets or properties are bound; (ii) violate any order, arbitration award, judgment, writ, injunction, decree, statute, rule or regulation applicable to Seller; or (iii) violate any other contractual or legal obligation or restriction to which the Seller is subject.

(h)      As of the closing date, Seller has no liabilities, to vendors or to any other creditors, which would affect the free and clear transfer of the Assets. Seller has duly filed all tax reports and returns required to be filed and has duly paid all taxes and other charges due or claimed to be due by Federal, State or local taxing authorities (including without limitation, those due in respect of its properties, income, franchises, licenses, sales and payrolls). Seller has not incurred any tax liabilities other than in the ordinary course of business; there are no tax liens (other than liens for current taxes not yet due) upon any properties or assets of Seller (whether personal or mixed, tangible or intangible), and, there are no pending or threatened questions or examinations relating to, or claims asserted for, taxes or assessments against Seller, and there is no basis for any such question or claim. Seller has not granted or been requested to grant any

Initials: _____
Company    Employee/Sell·

MAR-10-1997  13:32        205 764 5836

P.003

ASSET PURCHASE AGREEMENT                                          Page No. 3

extension of the limitation period applicable to any claim for taxes or assessments with respect to taxes.

(l)      Seller has in the past duly complied and is presently duly complying, in all material respects, in the conduct of its business and the ownership of the Assets with all applicable laws, whether statutory or otherwise, rules, regulations, orders, ordinances, judgments and decrees of all governmental authorities (Federal, State, local or otherwise) (collectively, "Laws"). Seller has not received any notice of, or notice of any investigation of, a possible violation of any applicable Laws, or any other Law or requirement relating to or affecting the operations or properties of Seller. There are no claims, actions, suits, proceedings or investigations pending or threatened by or against, or otherwise affecting Seller at law or in equity or before or by any Federal, State, municipal or other governmental department, commission, board, agency, instrumentality or authority. Seller does not know or have any reason to know of any basis for any such claim, action, suit, proceeding or investigation.

6.      Buyer's Representations and Warranties.

(a)      Buyer is a Tennessee General Partnership duly organized, validly existing and in good standing under the laws of the State of Tennessee.

(b)      Buyer has the full power and authority to execute, deliver and perform this Agreement and consummate the transaction herein contemplated.

(c)      There is no agent, broker or finder who has any right or claim against Buyer for a commission, brokerage fee, or similar right to compensation in connection with the transactions herein contemplated.

7.      Indemnifications. Seller hereby agrees to defend, indemnify and hold harmless Buyer, each fiduciary of Buyer's employee benefit plans (if any) and each of Buyer's owners, affiliates, officers, directors, employees, agents, successors and assigns ("Buyer's Indemnified Persons") and shall reimburse Buyer's Indemnified Persons for, from and against each claim, loss, liability, cost and expense (including without limitation, interest, penalties, costs of preparation and investigation, and the reasonable fees, disbursements and expenses of attorneys, accountants and other professional advisors) (collectively, "Losses"), directly or indirectly relating to, resulting from or arising out of any of the following for a period of ten (10) years from the date of closing:

(a)      Any untrue representation, misrepresentation, breach of warranty or nonfulfillment of any covenant, agreement or other obligation by or of Seller contained herein, in any Schedule hereto or in any certificate, document or instrument delivered to Buyer pursuant hereto.

(b)      Any tax liability of Seller not previously paid, which may at any time be asserted or assessed against it for any event or period prior to the Closing Date (regardless of whether the possibility of the assertion or assessment of any such tax liability shall have been disclosed to Buyer at or prior to the closing).

(c)      Any cost, expense or liability incurred by Buyer in connection with any pollution of the soil or ground water of, or originating from, any parcel of real property owned, leased or used by Seller which exists on the Closing Date (regardless of whether the possibility of such cost or expense shall have been disclosed to Buyer at or prior to the closing). The term pollution shall include any substance subject to any Federal, State, local or other law, rule, regulation or governmental regulation of any kind, as the same currently exists or as amended in the future, and the rules, regulations and orders promulgated thereunder or any other substance which constitutes a nuisance or hazard to the environment or to the public health, safety or welfare.

(d)      Any and all liabilities or obligations of Seller arising outside this Agreement.

(e)      Any cost, expense or liability resulting from any and all products liability actions, suits, proceedings, assessments, judgments, claims, costs and expenses including, without limitation, legal fees and expenses incidental to any of the foregoing which arise out of or are

Initials:  _CSR_          _MLM_ LGM
          Company        Employee/sdw

ASSET PURCHASE AGREEMENT                                      Page No. 4

based on facts in existence prior to the closing. The phrase "products liability" shall include any and all claims, whether based on strict liability, negligence or warranty, by any party alleging the sale, transfer or delivery by Seller of any product in a defective or dangerous condition which results in harm or injury to any user, person with whom Seller has dealt or others, whether such harm or injury to any user, person with whom Seller has dealt or others, whether such harm or injury is personal injury, property damage or economic loss.

    (f)    Any obligation or liability of Seller suffered or incurred by Buyer by reason of the failure by Seller to comply with Bulk Sales Laws.

    (g)    Any other Loss incidental to the foregoing.

Buyer hereby agrees for a period of one (1) year from the date of closing to defend, indemnify and hold harmless Seller, and shall reimburse Seller for, from and against Loses directly or indirectly relating to, resulting from or arising out of any of untrue misrepresentation, breach of warranty or nonfulfillment of any covenant, agreement or other obligation by Buyer contained herein or in any certificate, document or instrument delivered to Seller pursuant hereto.

8.    Closing.

Closing of the transaction set forth herein shall be held at 10:00 a.m. on Friday, August 13, 1993 at the offices of Buyer, or at such other time, date and place as the parties may mutually agree. In the absence of such mutual agreement, closing shall be held as provided in this paragraph.

9.    Delivery of Documents at Closing.

    (a)    At closing, Seller shall execute and deliver to Buyer a Bill of Sale conveying the assets to Buyer in the form attached hereto as Exhibit B and incorporated herein by reference. Seller shall also surrender all documents of title and possession in connection with the Assets to Buyer at closing.

    (b)    At closing, Buyer shall deliver in cash, cashier's check, or other acceptable means the purchase proceeds due in accordance with Section 2 above.

10.    Bulk Sales Compliance.

Buyer hereby waives compliance by Seller with the provisions of the bulk sales or similar laws of any and all states (the "Bulk Sales Laws"), and Seller covenants and agrees to pay and discharge when due all claims, liabilities and related expenses which may be asserted against buyer by reason of such noncompliance.

11.    Right of Offset.

In the event that Seller breaches any provision, covenant or warranty contained in this Agreement, Buyer shall have the immediate right, notwithstanding all other remedies at law and in equity (all of which shall remain available to Buyer), to offset any damages incurred or sustained by Buyer against any amounts owed by Buyer to Seller pursuant to that certain Nondisclosure/Employment At-Will Agreement between Buyer and Mark L. Moore, of even date herewith.

12.    Miscellaneous and Conditions Precedent.

    (a)    This Agreement and the Bill of Sale, supplemented by the Nondisclosure/Employment-at-Will Agreement and the Covenant Not To Compete, both of even date herewith, contain the entire agreement between the parties and shall not be modified except by a writing signed by the parties hereto.

    (b)    This Agreement shall be binding upon the parties hereto, and their heirs, executors, legal representatives, successors and assigns.

Initials: _____    _____
         Company    Employee

ASSET PURCHASE AGREEMENT                                    Page No. 5

    (c)    This Agreement shall be construed and enforced in accordance with the laws of the State of Tennessee. Venue in all proceedings shall be in Hamilton County, Tennessee.

    (d)    Each of the parties agrees to execute any and all additional documents reasonably necessary to effect the consummation of this Agreement.

    13.    It is a condition precedent to the obligations of Buyer under this Agreement that Mark L. Moore shall have entered into a Noncompetition Covenant and a Nondisclosure/Employment-At-Will Agreement, both in the form of Exhibits C and D, respectively, which are attached hereto and incorporated by reference herein.

    14.    All agreements, warranties and representations set forth herein shall survive the closing of this transaction. All other obligations of Seller to Buyer shall remain in full force and effect and shall survive the closing of this transaction.

    IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

               BUYER:

               COMMERCIAL - SOUTHERN RECYCLING,
               A Tennessee General Partnership

               By:
                     COMMERCIAL METALS SF/JV COMPANY,
                     General Partner
                     By:
                       Its:   SECRETARY

                     METAL RESOURCES OF TENNESSEE, INC.,
                     General Partner
                     By:
                       Its:

          SELLER:

               Mark L. Moore

               Leesa G. Moore

               Whitetail Leasing, Inc.
               By:
                  Its: President

               Whitetail Metals, Inc.
               By:
                  Its: President

               North Alabama Scrap Company
               By:
                  Its: Owner

               Moore and Landers, Inc.
               By:
                  Its: President

                       Initials:   CS JV     MLM LGM
                              Company     Employee/

# NON-COMPETITION COVENANT

THIS NON-COMPETITION COVENANT ("AGREEMENT"), is made and entered into this 24th day of August, 1993 by and between Commercial-Southern Recycling, a Tennessee General Partnership ("Buyer") and Mark L. Moore, an individual resident of Florence, Alabama ("Promisor").

## Preliminary Statement

Promisor, as the sole shareholder of Whitetail Leasing, Inc. and Whitetail Metals, Inc., as the owner of North Alabama Scrap Company and Individually (collectively, "Seller") is causing the sale of certain business assets and accounts of Seller. Seller and Buyer have entered into that certain Asset Purchase Agreement of even date herewith ("Purchase Agreement") respecting the sale by Seller (and Promisor) to Buyer of certain assets respecting Seller's scrap metal and salvage businesses (the "Business") operated by Seller. It is Promisor's desire to cease the operation of the Business and to become an employee of Buyer.

Seller has conducted the Business for a substantial number of years and Promisor has been employed in, or otherwise involved with, the Business in substantial capacities for a substantial number of years. Thereby, Promisor has made use of, acquired, and added to confidential information (exclusive of such information as is in the public domain) (collectively, "Confidential Information") of a special and unique nature and value relating to such matters as the Sellers' proprietary information, trade secrets, trademarks, systems, procedures, manuals, confidential reports, records, operational expertise, locations and lists of customers and potential customers or contacts and the nature and type of services rendered by the Seller (all of which are deemed for all purposes confidential and proprietary). Such Confidential Information is a portion of the assets of the Business, of which certain assets are being sold to Buyer.

Promisor also has developed unique relationships with customers, including, without limitation, the Tennessee Valley Authority ("TVA"), suppliers, and employees of the Business and unique information and knowledge about the competitive market, locations, potential customers, processes and prospects of the Business.

Buyer intends to employ the assets acquired by it for Buyer's business similar to the Business. The value of the Buyer's acquisition of such assets would be diminished materially in the event that Promisor were to compete with Buyer, to assist another person or entity to compete with Buyer, or to divulge any Confidential Information.

Promisor has agreed to provide such covenants as set forth herein as a material inducement to Buyer to enter into and close the Purchase Agreement and to employ Promisor.

Pursuant to the Purchase Agreement, Buyer and Promisor desire to set forth the terms and conditions of their agreements and understandings respecting such covenants.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises, the promises set forth herein, the Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by Seller and Promisor; and, intending to be legally bound, Promisor hereby agrees and covenants with Buyer as follows:

1. **Non-Disclosure of Information.** While Promisor is employed by Buyer, and at all times following the termination of Promisor's employment with Buyer, Promisor shall not directly or indirectly divulge or disclose for any purpose whatsoever any Confidential Information that has been developed by or for Seller, or obtained by, or disclosed to, Promisor by Seller at any time before or after the date hereof. In addition to, and not in limitation of, any other rights, remedies, or damages available to Buyer at law or in equity, Buyer shall be entitled to a permanent injunction in order to prevent Promisor or employers, employees, companies, consulting clients, and/or any and all persons directly or indirectly acting for or with Promisor from violating this Agreement. This covenant shall be in addition to the secrecy and nondisclosure covenants and obligations of Promisor as set forth in the Employment-At-Will/Nondisclosure Agreement of even date herewith and attached hereto.

Initials: _C$^{S?}$_  ___ _M;M_
Company     Employee

EXHIBIT "C"

**NON-COMPETITION COVENANT**                                    Page No. 2

2.    Covenants against Competition.    While Promisor is employed by Buyer and for a period of five (5) years thereafter, within a two hundred fifty (250) mile radius of Buyer's Chattanooga, Tennessee office:

(a)    Promisor shall not, directly or indirectly, solicit or divert from Buyer, or assist another person or entity to solicit or divert, scrap metal business or similar or related businesses or services or attempt to convert to his own benefit any other methods of using the same or similar products or services provided by the Seller (or otherwise) to any customer, account, or distributor of Buyer.

(b)    Promisor shall not, directly or indirectly, compete or engage in, or assist another person or entity to compete or engage in any scrap metal business or similar business in competition with Buyer's business.  The term "compete" as used herein means to engage in competition, directly or indirectly, either as a proprietor, creditor, employee, agent, consultant, director, officer, partner, or stockholder, or in any other capacity or manner whatever.

(c)    Promisor shall not, directly or indirectly, solicit employment of or employ any employee of the Buyer's business.

3.    Accounting for Profits.    If Promisor shall violate any of the provisions of Sections 1 or 2 of the Agreement, Buyer shall be entitled to an accounting and repayment of all profits, compensation, commissions, remuneration, or other benefits that Promisor directly or indirectly has realized and/or may realize as a result of, growing out of, or in connection with, any such violation.  These remedies shall be in addition to, and not in limitation of, any injunctive relief or other rights or remedies to which Buyer is or may be entitled under this Agreement.

4.    Reasonableness of Restrictions.

(a)    Promisor has carefully read and considered the provisions of Sections 1, 2, and 3, of the Agreement and having done so, agrees that the restrictions set forth in those Sections, are fair and reasonable and are reasonably required for the protection of the interests of the Buyer, and its owners, officers, directors, employees and affiliates.

(b)    In the event that, notwithstanding the foregoing, any of the provisions of Sections 1, 2, and 3 of the Agreement or any parts thereof shall be held to be invalid or unenforceable, the remaining provisions or parts thereof shall nevertheless continue to be valid and enforceable as though the invalid or unenforceable portions or parts had not been included therein.  In the event that any provisions of Sections 1 and 2 of the Agreement shall be declared by a court of competent jurisdiction to exceed the maximum restrictiveness such court deems reasonable and enforceable, the same as deemed reasonable and enforceable by the court shall become and thereafter be the maximum restriction in such regard, and the restriction shall remain enforceable to the fullest extent deemed reasonable by such court.

(c)    Notwithstanding any other provision of this Agreement, Promisor's performance of his duties as an employee of, or on behalf of, or as a consultant to Buyer or its affiliates, successors, or assigns shall not constitute a violation of this Agreement.

5.    Miscellaneous.

(a)    Benefit.    This Agreement shall be binding upon Promisor and his respective heirs, personal and legal representatives, successors, agents and assigns and shall inure to the benefit of, and be enforceable by, Buyer and its successors and assigns.

(b)    Construction and Jurisdiction.    This Agreement is being delivered and is intended to be substantially performed in the State of Tennessee and shall be construed and enforced in accordance with the laws thereof.  The parties hereto consent to jurisdiction and venue, in the State of Tennessee, County of Hamilton, regarding any dispute which arises hereunder.

(c)    Severability.    The invalidity or unenforceability of any provision of this Agreement shall not render invalid or unenforceable any other provision hereof.

(d)    Survival.    All terms of this Agreement shall survive the closing under the Purchase Agreement.

Initials: _____    _____
          Company              Employee

**NON-COMPETITION COVENANT**                                    Page No. 3

(e) _Enforcement_. In the event litigation or other legal proceedings are commenced by Buyer to enforce any rights under this Agreement, all reasonable legal expenses (including reasonable attorney's fees) and other direct costs of litigation of the prevailing party shall be paid by the non-prevailing party, with such determinations to be made by the Court or other tribunal hearing such proceeding. All remedies specified herein are cumulative and non-exclusive, and parties shall be entitled to seek or enforce any other rights or remedies available to them at law or in equity.

(f) _Waivers and Modifications_. No failure to enforce any right hereunder shall be deemed a waiver of such right by Buyer. No valid waiver of any provision of this Agreement at any time shall be deemed a waiver of any other provision of this Agreement at such time or at any other time. No change or modification in this Agreement shall be valid or binding unless it is in writing signed by Buyer and Promisor.

(g) _Entire Agreement_. This instrument (and the below referenced "Ancillary Documents") contains the entire agreement between the parties in connection with Promisor's relationship and employment with the Company; provided, however, that this Agreement shall be construed and enforced consistent with and in accordance with the following Ancillary Documents, all of which are of even date herewith: (1) Asset Purchase Agreement; (2) Covenant Not To Compete; (3) Bill of Sale. This Agreement or the provisions hereof may not be waived, changed or terminated orally, but may be changed only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification, extension, discharge or termination is sought.

IN WITNESS WHEREOF, this Agreement is executed by Buyer and Promisor to be effective as of the date first above written.

BUYER:

COMMERCIAL - SOUTHERN RECYCLING,
A Tennessee General Partnership

By:

COMMERCIAL METALS SPAN COMPANY,
General Partner
By:
Its:            SECRETARY

METAL RESOURCES OF TENNESSEE, INC.,
General Partner
By:
Its:            President

PROMISOR:

Mark L. Moore

STATE OF TENNESSEE:

COUNTY OF HAMILTON:

Personally appeared before me Mark Moore, the within named bargainor, with whom I am personally acquainted, and who acknowledged that he executed the within instrument for the purposes therein contained.

Witness my hand, at office, this 24ᵗʰ day of August, 1993.

Notary Public

My Commission Expires: 08-09-95

Initials:    Company    Employee

## NONDISCLOSURE EMPLOYMENT-AT-WILL AGREEMENT

THIS AGREEMENT (the "Agreement") made and entered into this 24th day of August, 1993 by and between Commercial-Southern Recycling, a Tennessee General Partnership (the "Company"), and Mark L. Moore (the "Employee"), a resident of Florence, Alabama.

### W I T N E S S E T H :

THAT WHEREAS, Employee desires at-will employment with the Company; and

WHEREAS, the Company wishes to provide at-will employment; and,

WHEREAS, the Company has purchased from Employee certain assets previously owned by Employee or his affiliates; and

WHEREAS, the Company and Employee both desire Employee's employment with the Company to be pursuant to the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, and other good and valuable consideration, the Company and the Employee agree as follows:

1.    Employment.  Employment shall be on an at-will basis.  Employee shall at all times be subject to, observe and carry-out such rules, regulations, policies, directions and restrictions as the Company shall from time to time establish.  Employee shall work for and be available for the benefit of the Company on a full-time basis.

2.    Compensation.

(a)  As full compensation for his services under this Agreement, the Company will pay Employee a Base Annual Salary of Sixty Thousand Dollars ($60,000.00).  Such salary shall be adjusted as the Company shall determine from time to time.

(b)  In addition to the Base Salary of Sixty Thousand Dollars ($60,000.00), the Company shall pay to Employee a Performance Bonus which is based upon the net after-tax profit of the Company as determined by the Company's accountants.  During the initial six (6) months of this Contract, the Performance Bonus shall be an amount equal to five percent (5%) of the net after-tax profit.  Commencing with the seventh (7th) month during which this Agreement is in force and continuing thereafter, Employee shall receive a Performance Bonus in the amount of seven and one-half percent (7-1/2%) of the net after-tax profit.  The Performance Bonus shall be calculated and paid quarterly, and the same shall be due thirty (30) days following the end of each quarter.  For the purposes of calculating the after-tax net profit of the Company, an assumed tax rate of thirty-five percent (35%) shall be utilized.  The term Annual Salary as used herein shall not imply that this Agreement constitutes an Annual Contract, but such term is used simply to state Employee's Base Salary on an annual basis.

3.    Expenses.  Employee shall bear his own expenses incurred in connection with the performance of his duties under this Agreement; provided, however, that Employee shall be entitled to reimbursements from the Company for those expenses which the Company authorizes Employee to incur.

Initials:     CSR                     MLM
          ‾‾‾‾‾‾‾‾‾         ‾‾‾‾‾‾‾‾‾‾
           Company              Employee

MAR-10-1997 13:28 US DIST CT FLORENCE 205 764 5836 P.11/13
Case 3:95-cv-00375-CLS Document 33 Filed 03/10/97 Page 30 of 30

NONDISCLOSURE/EMPLOYMENT-AT-WILL AGREEMENT    Page No. 2



**4.    Confidentiality and Ownership of Information and Intellectual Property.**

(a)    During Employee's employment with the Company or any affiliate and at any time thereafter, the Employee shall not in any manner, either directly or indirectly, divulge, disclose or communicate to any person or firm, except to or for the Company's benefit and at the Company's direction, any information of any kind concerning any matters affecting or relating to the business of the Company, its subsidiaries and/or affiliates which Employee may have acquired in the course of or as an incident to his employment by the Company or from any other source, without regard to whether such Information would be deemed confidential or material, the parties agreeing that such information affects the successful and effective conduct of the Company's business and its good will and that any breach of the terms of this Section 4, is a material breach of this Agreement. All of the trademarks, patents, records, files and materials used and/or developed by the Employee during his employment by the Company shall remain in the Company's possession and shall be its sole property.

(b)    In the event Employee has in his possession any data, information or documents, Employee shall deliver or return to the Company, immediately upon termination of employment, all such data, written or printed information or documents. Employee shall under no circumstances retain any copies, originals or other facsimiles thereof after termination of employment.

(c)    Employee shall promptly advise the Company of, and disclose to it, all ideas, improvements, and inventions, relating to the business or products of the Company whenever or however conceived and whether or not they are patentable or may be copyrighted or eligible for trademark protection.

(d)    Employee shall unconditionally assign without additional consideration all such ideas, improvements and inventions so made or conceived during the term of this Agreement to the Company or its nominees promptly upon being requested to do so by the Company.

(e)    Employee covenants that the Company or its nominee shall have the right to apply for domestic and foreign patents or other design, copyright or trademark protection covering all such ideas, improvements, or inventions assigned by Employee. Upon request, Employee shall assist the Company and its representatives in every proper way to apply for and obtain such domestic and foreign patents or other design, copyright or trademark protection and to protect and enforce the same, including without limitation, the giving of testimony, the execution of legal and other papers, including without limitation, separate instruments of assignment of the aforesaid ideas, improvements and inventions whenever considered necessary or desirable by the Company or its representatives.

5.    **Remedies and Injunctive Relief.** Recognizing that the remedy at law for any breach or threatened breach of the covenants contained in this Agreement may be inadequate, in the event of any breach or threatened breach of such covenants by Employee, in addition to any and all other legal and equitable remedies which may be available, Employer, or its successors or assigns, may obtain temporary and permanent injunctive relief without the necessity of proving actual damage by reason thereof, and, to the extent permissible under the applicable statutes and rules of procedure, a temporary injunction may be granted immediately upon the commencement of any such breach and without notice.

6.    **Covenant Not to Compete.** In consideration of the Company's entering into this Agreement, and for other good and valuable consideration, Employee agrees to enter into a separate noncompetition covenant in the form attached hereto as Exhibit One (1).

7.    **Warranties.** Employee warrants and represents that he has the right to enter into this Agreement, that he is not a party to any agreement which prevents his fulfilling all of his obligations hereunder or which impairs any rights or privileges granted to the Company hereunder. Employee agrees that all agreements with third parties executed by him during the period of this Agreement will provide that such agreements are subject to the terms and provisions of this Agreement.

Initials: _____ _____
Company   Employee