UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

**FILED**

98 AUG 18 PM 4: 37

U.S. DISTRICT COURT
N.D. OF ALABAMA

**ENTERED**

AUG 1 8 1998

| | |
|---|---|
| METALS RESOURCES, INC., d/b/a ) | |
| METALS RESOURCES OF TENNESSEE, | |
| INC., a Delaware corporation, ) | |
| and COMMERCIAL METALS | |
| SF/JV COMPANY, a subsidiary of ) | |
| COMMERCIAL METALS COMPANY, a | |
| Delaware corporation, ) | |
| collectively d/b/a COMMERCIAL- | |
| SOUTHERN RECYCLING, ) | |
| | |
|     Plaintiffs, ) | |
| | |
| vs. ) | Civil Action No. 95-S-375-NW |
| | |
| MARK L. MOORE, LEESA G. MOORE, ) | |
| WHITETAIL LEASING, INC., | |
| WHITETAIL METALS, INC., NORTH ) | |
| ALABAMA SCRAP COMPANY and MOORE | |
| AND LANDERS, INC., ) | |
| | |
|     Defendants. ) | |

**MEMORANDUM OPINION**

This action came on for trial by the court, sitting without benefit of a jury, on August 10, 1998.

The disputes among these parties center on three interrelated contracts executed by plaintiff Commercial Southern Recycling ("CSR"), a Tennessee general partnership created by the corporate plaintiffs,[1] and, defendants Mark L. Moore ("Moore") and wife Leesa G. Moore, acting both individually and as owners of the various defendant business ventures listed in the caption.

---

[1] The partnership was formed by the following entities: plaintiff Metal Resources, Inc., d/b/a Metals Resources of Tennessee, Inc., a Delaware Corporation, and plaintiff Commercial Metals SF/JV Company, a subsidiary of Commercial Metals Company, a Delaware Corporation. Southern Foundry Supply has succeeded to the interests of Commercial Metals.

The subject contracts include an "Asset Purchase Agreement" (Plaintiffs' Exhibit 2), a "Non-Competition Covenant" (Plaintiffs' Exhibit 3), and a "Nondisclosure Employment-At-Will Agreement."

During the time this action was assigned to Senior United States District Judge E. B. Haltom, Jr., that venerable husbandman of the law thoroughly plowed, tilled, and sifted all of the factual fields and legal grounds traversed by the parties herein.

The memorandum opinion and accompanying order Judge Haltom entered on March 10, 1997, while denying plaintiffs' motion for summary judgment, nevertheless resolved most of the issues of this action in accordance with Rule 56(d) of the Federal Rules of Civil Procedure. (See Doc. No. 33 & 34.)

For that reason, this opinion and Judge Haltom's are, as lawyers like to say, *in pari materia* and, accordingly, must be read together.

## Summary of Relevant Facts

For a number of years prior to the date Mark Moore executed the subject agreements, he engaged (among other ventures) in the business of collecting and reselling scrap metal. That enterprise proved profitable for Moore, primarily because of close relationships he nurtured with officers of the Tennessee Valley Authority.

The seeming profitability of Moore's scrap metal business is what apparently piqued the interest of the corporate plaintiffs. As Judge Haltom noted, Moore "previously had business dealings with both corporate Plaintiffs, Commercial Metals and Metals Resources,

2

and they were interested in purchasing all Moore's assets
pertaining to his scrap operations, especially the contracts with
TVA, for their CSR partnership."[2]

The parties executed the subject contracts on August 24, 1993.
Moore received a total of $185,000 as consideration for the "Asset
Purchase Agreement" and "Non-Competition Covenant": i.e., $183,500
was allocated to the value of the assets and accounts purchased by
CSR,[3] and $1,500 was specified as the consideration for Moore's
execution of the noncompetition covenant. (Plaintiffs' Exhibit 2
at 1, ¶ 3.)

The assets thereby acquired by CSR included numerous items of
tangible personal property, including more than thirty pieces of
heavy equipment. (Complaint, Exhibit B at 1.) The parties
stipulated that some of the equipment purchased by CSR lay at
various job sites on the date of acquisition. Plaintiffs neglected
to inspect most of the equipment before the agreements were
executed. (Principal Undisputed Facts Submitted by Plaintiff

---

[2] Memorandum Opinion entered March 10, 1997 (Doc. No. 33) at 3.

[3] The Asset Purchase Agreement provides, in pertinent part, as follows:

1.     Purchase and Sale of Assets. Seller agrees to sell,
transfer, convey, assign and deliver to Buyer and Buyer agrees to
purchase and accept from Seller all of the following assets . . .

. . . .

(ii)  Industrial Accounts and Service Contracts.
Seller currently services and removes scrap from or has
other business relationships with industrial accounts,
including without limitation, the Tennessee Valley
Authority ("TVA"), all of which Seller hereby sells,
transfers, conveys, assigns, and delivers, to Buyer.
Such accounts include, but are not limited to, those
listed in Exhibit A hereto.

3

("Stipulations"), Doc. No. 47 at 4.)

The noncompetition covenant prohibited Moore from competing with CSR within a 250 mile radius of CSR's Chattanooga, Tennessee office while he was employed by CSR, and for a period of five years thereafter. (Plaintiffs' Exhibit 3 at 2.) Specifically, the covenant prohibited direct or indirect solicitation or diversion from CSR of "scrap metal business or similar or related business or services" and assistance of another in such acts. *Id.* (emphasis supplied). This agreement further prohibited Moore from directly or indirectly competing, engaging in, or assisting others to compete or engage in "any scrap metal business or similar business in competition with [CSR]." *Id.* (emphasis supplied).

The noncompetition covenant defines "compete" as engaging in competition "directly or indirectly, either as a proprietor, creditor, employee, agent, consultant, director, officer, partner, or stockholder, or in any other capacity or manner whatever." *Id.* (emphasis supplied).

With regard to remedies for a breach, the noncompetition covenant provides that CSR shall be entitled to an accounting for all profits or other benefits that Moore received as a result of his breach, and that the non-prevailing party in any litigation to enforce rights under the agreement shall pay all reasonable legal expenses, including attorney's fees and other direct costs. *Id.* at 2, 3.

The deal struck by CSR with Moore did not prove profitable. CSR experienced losses during Moore's employ, and its corporate

partners decided during April of 1994 to cease partnership operations. CSR terminated Moore in June of 1994.[4]

Following the termination of his employment by CSR, Moore began working for Berman Brothers Iron & Metal Company, Inc. ("Berman"), a direct competitor of CSR and, subsequently, of CSR's general partners. (Memorandum Opinion, Doc. No. 33, at 4-5; See Plaintiffs' Exhibits 5-7.) For Berman, Moore supervised the processing of scrap removed from TVA's installations at Cumberland City and Widow's Creek. (Plaintiffs' Exhibit 8 at 82-83, 92-93.) Moore also leased his own equipment to Berman for use in its scrap operations. Id. at 5, 6.

Moore contends that such work was not a violation of his noncompetition covenant, because lead-based paint coated the scrap he handled for Berman, and CSR had refused to accept such scrap for processing during the period he worked for the plaintiff partnership.[5]

Moore was paid $400 a week by Berman, in addition to fees for the use of his equipment and vehicles. (Stipulations, Doc. No. 47 at 2.) During the period of Moore's employment by Berman, August 1994 to June 1995, Moore received a total of $68,667.02 in

---

[4] At trial, the parties disputed the date of termination. The court finds the date of termination, "June of 1994," in accordance with the stipulations of the parties (Doc. No. 47 at 2.), as opposed to what the court would have found based on the evidence presented at trial: i.e., April 8, 1994.

[5] Note, however, that Dale Hixson, Chief Financial Officer of Southern Foundry Supply, the principal shareholder of Metals Resources, Inc. (a general partner of CSR), testified that CSR would accept scrap metal covered with lead-based paint "from time to time." The court's resolution of this matter renders this distinction moot. See pp. 12-13 infra.

5

compensation from that company. *Id.* at 3. Plaintiffs assert two breach of contract claims and a conversion claim.

### Breach of Asset Purchase Agreement

The first contract claim is for breach of the Asset Purchase Agreement. As Judge Haltom noted, Tennessee law governs the construction and enforcement of the Asset Purchase Agreement and the noncompetition covenant for all purposes except the remedy, which is governed by Alabama law.

Judge Haltom found three elements of a breach of contract claim under Tennessee law: (1) a legal, enforceable contract between the parties; (2) a breach of the contract; and (3) damages resulting from the breach.[6] Judge Haltom found that the first of the foregoing elements had been established, and that the second would turn on the issue of delivery.

The Asset Purchase Agreement specifies no place for delivery of the equipment CSR acquired from Moore. (*See* Plaintiffs' Exhibit 2.) As previously noted, the parties stipulated that some of the equipment purchased by CSR lay at various job sites on the date of acquisition. CSR directed a truck driver to pick up the equipment located in Florence, Alabama. *Id.* Thereafter, plaintiffs made no further effort to obtain possession of or inspect the remaining equipment, either before this litigation commenced or since. Nearly all of the equipment presently is located at Moore's residence in Florence.

---

[6] Memorandum Opinion filed March 10, 1997 (Doc. No. 33) at 9-10.

6

One trailer and one magnet, however, remained at another site from the date CSR purchased those items until the owner of the land, a third party named Paul Johnson, sold the real property and stored the goods on other lands owned by him. Furthermore, after the sale, Moore used and stored the Westinghouse welder at a different location, leading to its "loss"[7] and replacement by Moore. Moore also continued to use the five sets of torches to cut scrap. (Plaintiffs' Exhibit 8 at 57.) The combined fair market value of these items is $3,250. (Plaintiffs' Exhibit 10.)

Article Two of Tennessee's version of the Uniform Commercial Code governs the Asset Purchase Agreement. *See Knoxville Rod and Bearing, Inc. v. Bettis Corp.*, 672 S.W. 2d 203, 206-07 (Tenn. Ct. App. 1984) (applying a rule of reasonable characterization of the transaction and finding wholesale tire distributor's sale of assets, including inventory, equipment, franchise rights, and accounts receivable to be a transaction in goods governed by the UCC).

Tennessee Code § 47-2-308 provides that, in the absence of a specified place for delivery and an agreement to the contrary,

> the place for delivery of goods is the seller's place of business or if he has none his residence; but . . . in a contract for sale of identified goods which to the knowledge of the parties at the time of contracting are in some other place, that place is the place for their delivery . . . .

Moore had no place of business and, therefore, satisfied any duty

---

[7] The landlord of the place at which Moore had stored the welder seized the welder as part of a distraint remedy for the tenant's (Moore's brother's) default.

7

of delivery with regard to the equipment held at his residence. Furthermore, the parties knew at the time of executing the asset purchase agreement that other goods subject to the contract were located elsewhere. Thus, no breach of a duty to deliver occurred for such goods.

Although currently situated on a third party's (Paul Johnson's) farm, the 49" (Ohio) Magnet and the 1968 "Trans Trailer" were available for CSR to pick up on the date the parties executed the Asset Purchase Agreement. Given the initial availability of those items, the removal of those items to another location by a third party, and the plaintiffs' obvious disregard for the assets acquired by CSR, this court finds that Moore has breached no duty of delivery as to the magnet and 1968 "Trans Trailer." Moore must, however, ensure safe and unencumbered transfer of those assets to plaintiffs from their current location at an agreed upon time, or retrieve the magnet and trailer and tender them at his residence with notice to plaintiffs, or pay plaintiffs the fair market value of such items. See generally Ala. Code § 7-2-503 (1975); see also Tenn. Code Ann. § 47-2-503. This court finds the fair market value of the magnet to be $4,900, and the fair market value of the trailer to be $4,000. (Plaintiffs' Exhibit 10.)

Moore used and stored the Westinghouse Welder at his brother's shop. The welder was not known by CSR to have been at this location on the date of contracting. Thus, Moore breached his duty to deliver or tender with respect to the welder. Even so, plaintiffs have not established the third element of their claim:

8

damages resulting from the breach. Moore replaced the welder seized by his brother's landlord,[8] and plaintiffs have offered no proof that the replacement is of lesser value, or is for some other reason unsatisfactory. In other words, plaintiffs have not rejected this tender that Moore reasonably expects to be acceptable.[9] *See generally* Tenn. Code Ann. § 47-2-508.

Plaintiffs also contend that Moore breached a duty to reasonably maintain and protect the equipment in his possession. Whether or not plaintiffs established a breach of duty with testimony regarding the method of storage graphically depicted in those photographs offered into evidence (*see* Plaintiffs' Exhibits 1-7), plaintiffs again fail to prove damages. Plaintiffs did not inspect the equipment prior to purchase and, therefore, any estimation of damages would be purely speculative. Moreover, Moore contends the equipment is in the same condition today that it was in on the date of the sale: "junk."

For all of the foregoing reasons, and, except for the magnet and 1968 "Trans Trailer" addressed on the preceding page of this opinion, defendants are entitled to judgment on plaintiffs' first breach of contract claim.

### Breach of Non-Competition Covenant

Plaintiffs' second contract claim is for breach of the noncompetition covenant. As Judge Haltom ruled, Tennessee law

---

[8] *See* note 7 and related text *supra*.

[9] The court's finding on the contract claim is independent of the conversion claim. *See* pp. 17-19 *infra*.

9

governs the construction and enforcement of that contract and Alabama law governs the remedy. Judge Haltom found that, under Tennessee law, plaintiff must establish three elements for breach of a covenant not to compete: (1) the covenant is valid and enforceable; (2) the covenant has been breached; and (3) damages resulted from the breach. (Memorandum Opinion, Doc. No. 33, at 13.)

With regard to the first element of such a claim, however, Judge Haltom clearly and correctly held that this federal court, exercising diversity jurisdiction and sitting in Alabama, must look to the law of the forum state.

> Alabama will only enforce the Tennessee law which holds this covenant valid to the extent that enforcing the covenant does not violate a fundamental tenet of Alabama public policy. *Hughes Assocs.*, 631 F. Supp. at 855; Restatement (Second) of Conflict of Laws § 187 (2) (b).
>
> Thus Plaintiff must show and this Court must determine whether the enforcement of this particular Noncompetition Covenant would violate a fundamental tenet of Alabama public policy. Section 8-1-1 of the Code of Alabama provides that contracts in restraint of trade are generally void except, as here, in the employer-employee context. Alabama courts have established guidelines for enforcing such employment covenants not to compete. To be enforceable, a covenant must meet the following criteria:
>
> 1.  the employer has a protectable interest;
> 2.  the restriction is reasonably related to that interest;
> 3.  the restriction is reasonable in time and place;
> 4.  the restriction imposes no undue hardship on the employee;
> 5.  there must be adequate consideration for the restriction.
>
> *See Hughes Assocs.*, 631 F. Supp. at 856; *Kemper v Cox and Assoc.*, 434 So. 2d 1380 (Ala. 1983); *Devoe v. Chatham*, 413 So. 2d 1141 (Ala. 1982); *Doughtry v. Capital Gas Co.*, 285 Ala. 89 (1970).

(Doc. No. 33 at 13-15.)

10

Judge Haltom further held there was no genuine issue of material fact as to the first, second, fourth, and fifth elements recited above and, therefore, that no proof need be offered at trial as to: (1) whether CSR had a protectable interest; (2) whether the restriction is reasonably related to that interest; (4) whether the restriction imposes no undue hardship on the employee; or (5) whether there was adequate consideration for the restriction. *Id.* at 13-17.

Accordingly, the only prerequisite for validity in issue at trial was the third: whether the restriction is reasonable in time and place. This court holds that it is.

The noncompetition covenant restricted Moore's actions within a 250 mile radius of CSR's Chattanooga office during the time he was employed by CSR under the terms of the parties' "Nondisclosure Employment-At-Will Agreement," and, for a period of five years thereafter. The geographic limitation is reasonable, because it encompasses virtually all of TVA's power generation facilities and other installations, from which Moore had purchased scrap metal. A period of five years also is a reasonable restriction. *See Tyson v. U.S. Pipe*, 240 So. 2d 674 (Ala. 1970); *Slay v. Hess*, 41 So. 2d 582 (Ala. 1949).

This finding of validity and enforceability is not defeated by the dissolution of the plaintiffs' partnership, because the corporate partners of CSR continue to operate in the scrap metal

11

business[10] in the same geographic area.   (*See, e.g.*, Plaintiffs'
Exhibit 5-7.) Alabama Code § 8-1-1(b) provides that

> [o]ne who sells the good will of a business may agree
> with the buyer and one who is employed as an agent,
> servant or employee may agree with his employer to
> refrain from carrying on or engaging in a similar
> business and from soliciting old customers of such
> employer within a specified county, city, or part thereof
> so long as the buyer, or any person deriving title to the
> goodwill from him, or employer carries on a like business
> therein.

CSR meets both prongs of the statutory provision.

On the one hand, CSR was the "buyer" of "the good will of
[Moore's] business,"[11]  and the plaintiff partners of CSR have
"derive[d] title to the goodwill from [CSR]." Ala. Code § 8-1-
1(b); *see also* C.J.S. *Partnership* § 376(b) (1950) ("[A]ll persons
who were partners at the time the obligation was incurred are
proper and necessary parties plaintiff in an action after
dissolution to enforce a firm claim."); *cf. Knox Kershaw, Inc. v.
Kershaw*, 552 So. 2d 126 (Ala. 1989) (finding that, upon separation
of ownership of companies, succeeding owner could enforce non-
competition agreement).

On the other hand, CSR also was Moore's employer.   The
Nondisclosure   Employment-At-Will   Agreement   referenced   the
noncompetition covenant in both paragraphs 6 and 15, and, appended
a copy of the covenant as an exhibit to the employment agreement.
In a recent opinion, *Sevier Insurance Agency v. Willis Corroon*

---

[10] The court finds Moore's distinction of the particular type of metal,
metal with lead-based paint coating, unavailing. *See* p. 13 *infra*.

[11] *See* note 3 *supra*.

12

*Corp.,* 711 So. 2d 995 (Ala. 1998), the Supreme Court of Alabama applied § 8-1-1(b) to a nonsolicitation agreement. In that case, the employer on the date of execution of the nonsolicitation agreement subsequently "merged with and/or was taken over" by the succeeding corporation.    The Court held that "a successor corporation can enforce nonsolicitation agreements that are otherwise valid and enforceable."

Thus, under both prongs of Alabama Code § 8-1-1(b), the succeeding partners of the dissolved CSR partnership can enforce this otherwise valid and enforceable restraint on competition.[12]

Having found the noncompetition covenant valid and enforceable, the court now must determine whether Moore breached the agreement and what, if any, damages plaintiffs incurred as a result.

Shortly after CSR terminated him as an employee, Moore began working for Berman, a direct competitor of CSR and its constituent partners.    Moore contends that he did not actually compete with CSR, because he worked with a particular type of scrap metal that

---

[12] *Sevier Ins.* involves a merger and/or takeover of a corporation instead of a partnership and is, therefore, not directly on point. In that case, the court discussed the applicability of § 10-2A-145(b)(4) of the Alabama Code (replaced by similar § 10-2B-11.06), which deals with the rights and privileges of a surviving corporation. *See Sevier Ins.*, 711 So. 2d at 1000. The recent enactment of the Uniform Partnership Act in Alabama, however, provides similar rules for partnerships. *See* Ala. Code §§ 10-8A-904 to 906 (Supp. 1997). The remaining distinction of a dissolution versus a merger or takeover may prove significant in future cases. Nevertheless, with respect to the case at bar, this court finds the recent opinion in *Sevier Ins.* applicable and strongly persuasive.

In any case, the court believes that plaintiffs can rely on the first prong of the statute: that is, on CSR's status as buyer and the plaintiff partners having derived title from CSR. Although *Sevier Ins.* would likely support plaintiffs' argument under the first prong as well, the court analyzed that case in the employer-employee context. *See* 711 So. 2d at 999, 1000.

13

CSR would not accept. The agreement, however, does not permit such fine distinctions. (*See* p. 4 *supra*.) Moore breached the noncompetition covenant.

As noted above, Alabama law governs the remedy for the breach of the noncompetition covenant. Under the law of that State, nominal damages are presumed for a violation of a covenant not to compete. *Kemper & Co. v. Cox & Associates*, 434 So. 2d 1380, 1385 (Ala. 1983). Upon proof of actual damages, plaintiff also may recover compensatory damages. *Id.* at 1386. The measure for compensatory damages is the amount of loss suffered due to the breach. *Id.* at 1386. The noncompetition covenant speaks to the issue of damages in two respects. First, the agreement provides that CSR shall be entitled to an accounting of all profits and other benefits received by Moore as a result of his breach. The parties also agreed that the party prevailing in any litigation to enforce the noncompetition covenant shall be entitled to costs and attorney's fees.

Plaintiffs claim as damages the money that Berman paid Moore, an aggregate of $86,267.02: *i.e.*, $68,667.02 paid to Moore for the delivery of scrap metal, plus $17,600 in salary (computed at the rate of $400 a week). In *Corson v. Universal Door Systems*, 596 So. 2d 565 (Ala. 1991), however, the Supreme Court of Alabama said the measure of damages for nonsolicitation covenants in employment contracts was lost net profits. The plaintiff in *Corson* had relied at trial on proof of the value of work that plaintiff's competitors performed as a result of defendant's solicitation in breach of the

14

parties' agreement.    The Alabama Supreme Court rejected that
approach, finding plaintiff's proffer insufficient to establish
damages because it produced no evidence that it would have received
this revenue but for the breach.  *Id.* at 570-71.

Similarly, plaintiffs in the instant case fail to show they
would have secured the contracts that Moore worked on for Berman.[13]
Consequently, the $86,267.02 claimed is speculative.  *See Knox
Kershaw, Inc. v. Kershaw*, 552 So. 2d 126, 128 (Ala. 1989)
(affirming refusal to award actual damages for breach of a
noncompetition agreement where trial court could have found the
evidence speculative).    In fact, plaintiffs fail to establish the
actual profit Berman received as a result of the breach, that is of
Moore's work for Berman.  Consequently, even if the court assumed
(which it does not) that plaintiffs would have secured this work
but for Moore's competition, plaintiffs' figure does not reflect
the true measure of damages.  *See Kemper*, 434 So. 2d at 1386.

Notwithstanding any failure of proof regarding actual damages,
nominal damages must be awarded to plaintiffs under Alabama law.
*Id.* at 1385.  Defendant seeks $10,000 in nominal damages.  Nominal

---

[13] Plaintiffs rely on *Kemper* to support their damages figure, stating only
that "[p]remiums or commissions diverted to one other than the promisee were
considered as part of actual damages." (Plaintiffs' Trial Brief at 14.)    In
*Kemper*, the premiums and commissions were actual losses to the plaintiff because
they arose from the insurer's existing clients.  Therefore, the diversion or
alteration of these funds were actual losses suffered as a direct result of the
defendant's competition in breach of the parties' agreement.  *Kemper*, 434 So. 2d
at 1386.  In the instant case, plaintiffs offer no evidence that they would have
secured the business and resulting profits (though none were established) but for
Moore's breach.

15

damages, however, should be "a trifling sum."[14]  *See Matherne v. Wilson*, 851 F.2d 752 (5th Cir. 1988) (stating that nominal damage award must be "truly nominal"). The court finds that plaintiffs are entitled to $10 in nominal damages.

Plaintiffs may base the $86,267.02 figure they claim as damages on the remedy provided in the noncompetition covenant. Paragraph three of the noncompetition covenant reads as follows:

> 3.    Accounting for Profits.    If Promisor shall violate any of the provisions of Sections 1 or 2 of the agreement, Buyer shall be entitled to an accounting and repayment of all profits, compensation, commissions, remuneration, or other benefits that Promisor directly or indirectly has realized and/or may realize as a result of, growing out of, or in connection with, any such violation.  These remedies shall be in addition to, and not in limitation of, any injunctive relief or other rights or remedies to which Buyer is or may be entitled under this Agreement.

(Plaintiffs' Exhibit 3 at 2 emphasis in original.) The court finds that this "liquidated damages" clause is actually a penalty designed to ensure performance of the noncompetition covenant. Acknowledging that penalties are void as against public policy in Alabama, that State's supreme court, in *Camelot Music, Inc. v. Marx Realty & Improvement Co.*, 514 So. 2d 987 (1987), listed three criteria to distinguish valid liquidated damages provisions from a penalty: (1) the injury caused by the breach must be difficult or impossible to accurately estimate; (2) the parties must intend to provide for damages rather than for a penalty; and (3) the sum stipulated must be a reasonable pre-breach estimate of the probable

---

[14] Black's Law Dictionary 392 (6th ed. 1990).

16

loss. This court finds the clause in the noncompetition covenant troublesome with regard to the second and third criteria.

In *Camelot Music,* the Alabama Supreme Court noted that, in all cases of doubtful intention, Alabama courts should find the provision to be a penalty. The stated basis of damages in the noncompetition covenant at issue herein is far too broad to constitute a reasonable estimate of damages (the measure of which is lost profit in such cases, see p. 14 *supra*), and to evince an intent to provide for actual damages as opposed to a penalty as security for performance. The agreement provides that "Buyer shall be entitled to an accounting and repayment of all profits, compensation, commissions, remuneration, or other benefits that Promisor directly or indirectly realized . . . as a result of, growing out of, or in connection with, any such violation." (Emphasis supplied.) Thus plaintiffs' argument for its damages estimate in reliance on the contract provision is unavailing. The court finds plaintiffs' proper remedies to be injunctive relief and attorney's fees.

In addition to damages, plaintiffs seek injunctive relief to enforce rights under the noncompetition covenant. Injunctive relief is proper for a violation of a covenant not to compete. *See Tyson v. U.S. Pipe,* 240 So. 2d 674 (Ala. 1970); *Slay v. Hess,* 41 So. 2d 582 (Ala. 1949). The noncompetition covenant at issue here obliges Moore to refrain from two broadly defined types of action (or assisting others in such actions): (1) soliciting or diverting scrap metal or similar or related business from plaintiffs; and (2)

17

competing or engaging in scrap metal or similar business. (Plaintiffs' Exhibit 3 at 2.) The agreement states that the term "compete" means "to engage in competition, directly or indirectly, either as a proprietor, creditor, employee, agent, consultant, director, officer, partner, or stockholder, or in any other capacity or manner whatever." *Id.* The agreement holds these restrictions in effect for the five year period following the date of Moore's termination by CSR, June 1994.[15] This valid and enforceable agreement shall remain in effect until June 1999.

Plaintiffs claim $23,787.37 in attorney's fees and expenses incurred in enforcement of the noncompetition covenant. As noted above, the agreement provides such recovery to the prevailing party. The figure is based on a reasonable legal fee of $100 an hour, and is supported by a detailed billing record and by affidavit. (Plaintiffs' Exhibit 9.) As the prevailing party in the action on this agreement, plaintiffs are entitled to the amount claimed in fees and costs. *See Knox Kershaw*, 552 So. 2d at 129 (holding that plaintiff was "clearly entitled" to an award of attorney's fees that was expressly provided for in the noncompetition agreement).

## Conversion Claim

Plaintiffs finally claim that Moore committed the tort of conversion. Alabama law applies to this claim. (Memorandum Opinion, Doc. No. 33, at 9-10.) Plaintiffs can establish

---

[15] *See* note 4 *supra.*

18

conversion by proving, among other things, that Moore appropriated plaintiffs' property to his own use and benefit. *Rice v. Birmingham Coal & Coke Co.*, 608 So. 2d 713, 714 (Ala. 1992). As previously noted, however, Moore had no duty to deliver the equipment subject to the Asset Purchase Agreement to CSR at any place other than his residence or the location of such items on the date the agreement was executed. Thus, Moore did not convert any equipment that he merely held in anticipation of plaintiffs' retrieval. Moore, however, did convert equipment that he used for his own benefit: that is, the Westinghouse Welder and the five sets of torches.

The measure of damages for conversion is "the value of the property at the date of conversion; or the value of the property at any time between the date of the conversion and the trial, whichever is greater, with interest at the rate of six percent per annum from the date of the conversion." *Edwards v. Vanzant*, 492 So. 2d 990, 994 (Ala. 1986) (emphasis supplied) (applying *Alabama Pattern Jury Instructions--Civil* § 39.01 (1984 Supp.)). The parties have assigned the following values to the property in issue: $1,750.00 for the welder and $1,500 for the torches. (Plaintiffs' Exhibit 10.) Because plaintiffs offered no evidence of the date of conversion, interest shall accrue from the date that the facts demonstrating conversion were established: June 29, 1995, the date of Moore's deposition. (Plaintiffs' Exhibit 8 at 1, 57, 143.) The interest that has accrued over this three year period is $585. Thus, plaintiffs have incurred damages as a result

19

of Moore's conversion in the amount $3,835.

Although the replacement welder and the torches are available for plaintiffs to retrieve, this evidence goes to the mitigation of damages. The tort claim is complete when the property is converted, and the replacement or recovery of the goods merely reduces plaintiffs' damages. *Rice*, 608 So. 2d at 716. Critical to the instant case, because the value of property at the time of return is evidence of mitigation, the burden of production on this point rests with Moore. *Id.* Moore's own statement at trial that the property is generally in the same condition it was in at the time of sale ("junk") is insufficient to establish a value for the court to assign in mitigation.[16]

## Defendants' Counterclaim

Defendants counterclaim for $7,317.01 in wages and equipment rentals. Moore claims that invoices submitted to CSR (Defendants' Exhibits 10-17 excluding 13) reflect this amount. CSR admittedly did not pay $4,510 of the amount claimed by defendants; rather, CSR set off that amount against a sale of crossties, an advance for expenses, and tanks that were rented but not returned. Furthermore, as CSR's records reflect, CSR never received three invoices totaling $4,889.01 (Defendants' Exhibits 10, 16, 17). These three invoices were not produced until trial. At deposition, defendant Leesa G. Moore produced only a handwritten list of the work and rentals for this period. (Plaintiffs' Exhibit 8 at 62.)

---

[16] Furthermore, this court finds the condition that Moore ascribed to the property, "junk," inapposite to property that Moore admittedly used for his own benefit.

20

No other evidence was introduced to support the claim for compensation reflected in these invoices. During deposition and at trial Moore used the claim that plaintiffs owed him money as a reason for his refusal to deliver plaintiffs' equipment in his possession. *Id.* at 60-61. Given the belated production of the invoices and the absence of any record in CSR's files, the court is not reasonably satisfied by a preponderance of the evidence that the plaintiffs owe Moore the sums reflected in the three invoices, defendants' exhibits 10, 16, and 17. However, the court is satisfied by the testimony at trial that plaintiffs appropriately set off $4,510 in full satisfaction of the compensation owed Moore. Subtracting the $4,501 and the amount reflected in defendants' exhibits 10, 16, and 17 from the $7,317.01 claimed by defendants in their counterclaim, plaintiffs have satisfied defendants' claim and then some. Plaintiffs make no claim for any discrepancy with regard to the excess of the amount applied as a set off.[17] (Damages Itemized by Plaintiffs, Doc. No. 48.)

A separate judgment consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this __18th__ day of August, 1998.

United States District Judge

---

[17] At trial, Hixson testified that the amount paid in excess of Moore's invoices (not including Defendants' Exhibits 10, 16, and 17) was negligible, $60. Apparently, a portion of the money applied to set off defendants' claim satisfied some of the services reflected in defendants' exhibits 10, 16, and 17, thus reducing the discrepancy in plaintiffs' overpayment versus the amount due Moore.

21